T.C. Memo. 1996-13


UNITED STATES TAX COURT


SOUTHERN BOILER SALES & SERVICE, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18272-93.              Filed January 22, 1996.


<u>Mathew E. Bates</u>, for petitioner.

<u>Amy Dyar Seals</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARKER, <u>Judge</u>:  Respondent determined deficiencies in petitioner's corporate Federal income tax and an addition to tax and penalty as follows:

| Taxable Year Ending | Deficiency | Addition to Tax Sec. 6653(a) | Penalty Sec. 6662 |
|---|---|---|---|
| 7-31-89 | $12,363 | $618 | -- |
| 7-31-90 | 21,571 | -- | $4,314 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision are:  (1) The fair market rental value of the property leased by petitioner from its president and sole shareholder, (2) whether some further adjustment to petitioner's gross receipts is required, and (3) whether petitioner is liable for the addition to tax for negligence under section 6653(a) for the taxable year 1989 and for the penalty for negligence under section 6662 for the taxable year 1990.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner was located in Pleasant Garden, North Carolina, at the time it filed its petition in this case.  Petitioner is in the business of selling, installing, and maintaining boilers, boiler parts, and supplies.  The business began in 1985 and was incorporated on September 11, 1987.  Luther Ray Berry (Berry) is petitioner's president and 100-percent shareholder.

On March 23, 1989, Berry organized a new corporation, Southern Boiler Sales and Service No. 2, Inc. (No. 2), to expand into the business of installing and maintaining pipes.  Berry owned 100 percent of this corporation as well.  However, the expansion did not materialize, and the business and activity of

No. 2 was the same as that of petitioner.  The parties now agree that petitioner and No. 2 are really one corporation, and the notice of deficiency generally has combined the gross receipts, costs of sales, income, and deductions reported on the corporate tax returns of the two.

Petitioner had seven employees, five of whom, including Berry, were technicians.  The technicians worked at the customers' sites.

Since its inception, petitioner has leased property owned by Berry and his wife (the property) for its offices and parts department.  Prior to petitioner's use of the property, it had served as the Berrys' personal residence.  The property consists of a 2,031-square-foot house and two storage sheds (70 and 130 square feet, respectively) on three-quarters of an acre of land.

Petitioner stored pipefittings and insulation in the two sheds.  Welding equipment and a pipe rack stood outside.  The gravel driveway was large enough to park nine vehicles, including a van and a 1-ton truck.  Generally, four or five vehicles would be parked there for some period during a normal business day.  Petitioner had no identifying signs on the property other than those on the truck when it was parked there.  The property had a well and septic system and was not served by city water or sewer.

The property is located on Neelley Road in Pleasant Garden, North Carolina.  During the years at issue, Pleasant Garden was a rural community that was becoming increasingly suburban, with the

nearby city of Greensboro as its focus.  However, the limited availability of public water and sewer lines and the unsuitability of the soil for septic tanks in parts of Pleasant Garden restricted residential development.  The immediate neighborhood of the property was a well-established residential area, with some new development within a mile of the property. Behind the property, but not part of the property, was a pasture for grazing cows.

The property is in an area that was, and as of the time of the trial continued to be, zoned residential-agricultural.  The zoning designation was RA-40, residential-agricultural.  The Guilford County Zoning Ordinance described the RA-40 zoning district as "a district in which the principal use of the land is for general suburban-residential and agricultural purposes."  One of the stated intents of this zoning was "to prohibit scattered commercial and industrial uses of land".

Regardless of the zoning, one neighborhood resident operated an accounting business from his home.  Another resident conducted a construction and repair business, using his home for the office functions and performing the construction work at the customers' sites.  A third resident had a commercial dumpster and several vehicles parked at his home.  One of the houses in the neighborhood was used exclusively as a dental office. Petitioner's use of the property as an office violated the local zoning ordinance.  Despite the zoning violations by petitioner

and other residents, the overall appearance of the neighborhood was that of a residential community.

The record does not establish how much rent petitioner (and/or No. 2) actually paid the Berrys for leasing the property.[1]

The firm of A & F Bookkeepers (A & F) prepared the corporate tax returns of petitioner and No. 2 for the years at issue. Petitioner provided A & F with check stubs, bank statements, and other paperwork in order for it to perform these functions. The owner of A & F, Bill Anderson, held himself out as a public accountant. No representative of A & F appeared or testified at the trial or provided any other evidence.

Petitioner filed Federal corporate income tax returns for its taxable years ending July 31, 1989, and July 31, 1990, reporting the following:

| Item | FYE 7-31-89 | FYE 7-31-90 |
|------|------------|------------|
| Gross Receipts | $614,178 | $513,413 |
| Costs of Sales | (210,441) | (85,457) |
| Interest Income | 1,335 | 1,750 |
| Other Deductions | (67,269) | (80,552) |
| Rental Expense | (15,600) | (14,979) |
| Depreciation | (16,851) | (18,399) |

---

[1] As an attachment to respondent's trial memorandum, there is a "Schedule of Rent Paid to Shareholder". That schedule was never authenticated or offered into evidence and thus is not part of the evidentiary record of this case. There is no evidence in the record to support the ex parte statements contained in that schedule or in respondent's post-trial brief. However, the Court deems respondent to have conceded that petitioner and No. 2 paid the Berrys at least the amounts of rental expense allowed by respondent in the notice of deficiency, $8,400 and $8,979 for FYE 7-31-89 and FYE 7-31-90, respectively.

No. 2 filed corporate tax returns for its taxable years ending
April 30, 1990, and April 30, 1991, reporting the following:

| Item | FYE 4-30-90 | FYE 4-30-91 |
|------|-------------|-------------|
| Gross Receipts | $248,662 | -0- |
| Costs of Sales | (47,754) | -0- |
| Interest Income | 3,861 | -0- |
| Other Deductions | (94,105) | ($29,303) |
| Rental Expense | (11,690) | -0- |
| Depreciation | -0- | -0- |

Berry gave petitioner's returns and No. 2's returns only a
cursory review prior to signing and filing them.

On audit, respondent determined that petitioner and No. 2
were one business and combined their gross receipts, costs of
sales, income, and expense items.  It is not clear from the
notice of deficiency, the record in this case, or the parties'
arguments as to exactly how or on what basis (accrual, actual
receipt, and/or overlapping of fiscal years) the gross receipts,
costs of sales, income, and expense items were combined.[2]
Petitioner has agreed that petitioner and No. 2 are one
corporation and has conceded most of the adjustments in the
deficiency notice.

---

[2]  We note that the first 3 months of No. 2's FYE 4-30-90
overlapped the last 3 months of petitioner's FYE
7-31-89, and the last 9 months of No. 2's FYE 4-30-90 overlapped
the first 9 months of petitioner's FYE 7-31-90.  However, No. 2's
gross receipts, costs of sales, income, and deduction items
apparently were not allocated one-fourth to petitioner's FYE
7-31-89 and three-fourths to petitioner's FYE 7-31-90.  The
method of allocation used by respondent and accepted by
petitioner is not disclosed by the record.  No. 2 filed only two
tax returns during its brief "existence".

Respondent disallowed portions of the rental expenses claimed for the years at issue. The notice of deficiency states that:

> It is determined that your Rents are $8,400 and $8,979 instead of $15,600 and $14,979 as shown on your income tax returns for the tax years 7-31-89 and 7-31-90, respectively. Therefore your taxable income is increased in the amounts of $7,200 and $6,000 for the tax years ended July 31, 1989 and July 31, 1990, respectively.

The record does not establish how much rent petitioner and No. 2 actually paid to Berry. See supra note 1. No. 2 deducted $11,690 rental expense on its return for its taxable year ended April 30, 1990, and this amount was not mentioned in the notice of deficiency.[3]

In total, the notice of deficiency adjusted petitioner's income as follows:

| Item | FYE 7-31-89 | FYE 7-31-90 |
|------|-------------|-------------|
| Gross Receipts | $135,934 | $200,909 |
| Cost of Sales | (39,581) | (8,173) |
| Interest Income | 1,336 | 2,525 |
| Other Deductions | (57,585) | (126,540) |
| Rental Expense | 7,200 | 6,000 |
| Depreciation | 6,513 | 6,513 |

The notice of deficiency increased petitioner's gross receipts by $135,934 for its taxable year ended July 31, 1989,

---

[3] Respondent's counsel insists that respondent actually allowed petitioner rental expense deductions of $12,000 each year, rather than the $8,400 and $8,979. See supra note 1. Perhaps this matter can be clarified in the parties' Rule 155 computations.

and by $200,909 for its taxable year ended July 31, 1990, for total gross receipts of $750,112 for 1989 and $714,322 for 1990. Petitioner stipulated to the additional gross receipts for each year. The $135,934 plus the $200,909 totals $336,843, which includes the full $248,662 of No. 2's gross receipts plus $88,181. Respondent determined that $88,181 of gross receipts deposited in petitioner's bank account during August of 1990 should be removed from petitioner's taxable year ended July 31, 1991, and included in its taxable year ended July 31, 1990. The deficiency notice shows that the gross receipts for the taxable year ended July 31, 1991 were reduced by $88,181.

The deficiency notice allocated the $47,754 of No. 2's costs of sales to petitioner, $39,581 to its taxable year ended July 31, 1989, and $8,173 to its taxable year ended July 31, 1990. The record does not indicate the basis for the allocation. That adjustment increased petitioner's deductions for costs of sales from $210,441 to $250,022 and from $85,457 to $93,630 for those years, respectively. Petitioner has not challenged that adjustment.

Of the $3,861 of interest income No. 2 reported on its return for taxable year ending April 30, 1990, the deficiency notice allocated $1,336 to petitioner's income for its taxable year ended July 31, 1989, and $2,525 to its taxable year ended July 31, 1990, thus increasing petitioner's total interest income to $2,671 and $4,275 for those respective years. The record does

not explain the basis of the allocation between the 2 years. Petitioner stipulated to those additional amounts of interest income.

Of the other deductions of $94,105 No. 2 deducted for its taxable year ended April 30, 1990, and $29,303 for its taxable year ended April 30, 1991, the deficiency notice increased petitioner's other deductions by $57,585 for a total of $124,854 for its taxable year ended July 31, 1989, and by $126,540 for a total of $207,092 for its taxable year ended July 31, 1990. These total increased other deductions of $184,125 exceed No. 2's claimed total other deductions by an amount of $60,717. The record does not explain the source of these additional deductions, but neither party has challenged this adjustment.

Petitioner deducted depreciation of $16,851 for its taxable year ended July 31, 1989, and $18,399 for its taxable year ended July 31, 1990. No. 2 claimed no depreciation deductions. Respondent disallowed $6,513 of petitioner's claimed depreciation each year, the portion relating to a Chrysler New Yorker automobile and a boat. Petitioner has conceded that adjustment.

Respondent determined an addition to tax for negligence under section 6653(a) for the taxable year ended July 31, 1989, and a penalty for negligence under section 6662(a) for the taxable year ended July 31, 1990. Respondent determined the addition and penalty on the full amounts of the deficiencies, taking into account the tax shown on the tax returns filed by

petitioner for taxable years ending July 31, 1989, and July 31, 1990. The notice of deficiency apparently did not consider any part of the $7,165 in tax shown on the return filed by No. 2 for its taxable year ended April 30, 1990. Respondent determined overpayments of tax for petitioner's taxable years 1988 and 1991, the former due to a loss carryback from 1991 resulting from the $88,181 reduction in gross receipts for 1991.[4]

---

[4] On October 17, 1994, petitioner filed a motion for leave to amend petition which the Court denied due to petitioner's failure to state what issue or issues it wished to raise with respect to the 1988 and 1991 taxable years. See Rule 34(b)(4) and (5). Petitioner had proposed to amend its petition to add:

> The Commissioner erred in failing to correctly determine the extent to which changes to Petitioner's tax liability for its taxable years ended July 31, 1988 and July 31, 1991 affected Petitioner's tax liability for the taxable years ended July 31, 1989 and July 31, 1990.

Petitioner alleged no specific supporting facts, only that:

> Re-determinations of Petitioner's tax liabilities for its taxable years ended July 31, 1988 and July 31, 1991, or changes which the Commissioner should have made but failed to make to said taxable years, will affect Petitioner's tax liabilities for the years over which the Court has jurisdiction, being the fiscal years ending July 31, 1989 and July 31, 1990.

In denying petitioner's motion for leave to amend, the Court's order of October 19, 1994, stated:

> The Proposed Amendment to Petition is extremely vague and fails to state what issue or issues petitioner wishes to raise in regard to the 1988 and 1991 taxable years.

Petitioner has never clarified any such issues.

In preparation for trial, both parties caused the rental property to be appraised. Petitioner's appraiser did not appear at the trial, and his report was not received into evidence. Although Berry testified regarding the property's description and use, petitioner offered no evidence of the property's fair market rental value.

Respondent's expert, Daniel G. Barker (Barker), appraised the fair market rental value of the leased property at $8,300 per year. Respondent served a copy of Barker's report on petitioner on October 26, 1994. Petitioner did not dispute Barker's qualifications as an expert witness or his methodology. Respondent's trial memorandum indicated that she would move to amend the pleadings to conform to the proof and request an increased deficiency.

Barker based his appraisal on the highest and best use of the property as residential property. He considered the property too small to rent for agricultural use, the only other use permitted by the zoning. Using the market comparison approach, Barker considered four residential rental properties, three of which were located within Greensboro city limits, as comparables.

According to Barker, the Neelley Road property was in better condition, slightly larger in size, and in a more attractive neighborhood that any of the comparable properties. However, Barker believed that properties located in or near Greensboro would be in greater demand because of proximity to employment,

shopping, and services, and thus would command higher rents than those in Pleasant Garden.  Adjusting for location, size, and condition, Barker calculated the comparables' annual rents to be $7,521, $7,950, $8,280, and $8,280.

To corroborate this method, Barker also used the cost approach of valuation.  Using the mid-range of the sales prices of four lots facing Neelley Road ($22,500) and valuing the improvements to the property according to the Marshall & Swift Residential Cost Handbook ($57,798), Barker determined a total property value of $80,298.  To this value, Barker applied a discount rate of 10 percent, which he derived from listings of lease-to-own residential properties, to reach a rent of $8,030. This value was within the range of rents calculated under the market comparison approach.  Using the comparable rents as the most reliable indicator of fair market rental, Barker appraised the annual rental value of the property at $8,300.[5]

---

[5]  After trial, respondent filed a motion for leave of court to file amendment, which the Court granted.  Respondent's amended answer to the petition asserted $8,300 as the yearly fair market rental value of the property and increased petitioner's deficiencies in income tax to $13,621 and $23,014, for FYE 7-31-89 and FYE 7-31-90, respectively, the addition for taxable year 1989 to $681, and the penalty for taxable year 1990 to $4,603. Given that the original notice of deficiency allowed rents of $8,400 and $8,979 for the taxable years 1989 and 1990, respectively, the disproportionate increases in the deficiencies ($1,258 and 1,443) indicate that respondent may not have used $8,300 in recalculating petitioner's taxable income, or may have relied on her contention that respondent had allowed rents of $12,000 each year.  See supra note 3.  The proper deficiency amounts can be calculated in the Rule 155 proceedings.

OPINION

Fair Market Rental Value

Section 162(a)(3) provides that a taxpayer may deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including:

> rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

Section 162(a)(3) by its terms does not limit deductions for rental payments to a "reasonable" amount, but when the lessor and lessee have a close relationship and no arm's-length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid exceeds what the lessee would have been required to pay had he dealt at arm's length with a stranger. Sparks Nugget v. Commissioner, 458 F.2d 631, 635 (9th Cir. 1972), affg. T.C. Memo. 1970-74; Place v. Commissioner, 17 T.C. 199, 203 (1951), affd. per curiam 199 F.2d 373 (6th Cir. 1952). The taxpayer must establish that the sums paid were in fact rentals that he would have been required to pay in an arm's-length deal; to do so, he must show the amounts paid were reasonable. Place v. Commissioner, supra at 204.

The fair market value of a property must reflect the highest and best use of the property on the relevant valuation date. Estate of Juden v. Commissioner, 865 F.2d 960, 963 (8th Cir. 1989), affg. T.C. Memo. 1987-302; Stanley Works & Subsidiaries v.

Commissioner, 87 T.C. 389, 400 (1986).  The highest and best use is the "reasonable and probable use that supports the highest present value".  Symington v. Commissioner, 87 T.C. 892, 897 (1986).  The fair market value is not affected by whether the property is put to its highest and best use; the realistic, objective potential uses control its valuation.  Stanley Works & Subsidiaries v. Commissioner, supra.  If existing zoning restrictions preclude a more profitable use, ordinarily such use should not be considered.  United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir. 1958).  If the possibility of a zoning reclassification is a reasonable one, however, this is an element that can be taken into account.  Id.; Frazee v. Commissioner, 98 T.C. 554, 564 (1992).

Petitioner's position is that the amounts of $15,500 and $14,979 deducted as rental expenses on its 1989 and 1990 returns, respectively, were reasonable.[6]  Respondent asserts through her amended answer that the fair market rental value of the property was $8,300 per year, that petitioner's rental deductions should be limited to this value, and that respondent is entitled to increased deficiencies and additions (penalties).[7]

---

[6]  Presumably petitioner concedes the $11,690 in rent deducted on the return filed as No. 2.  See supra notes 1, 3.

[7]  Petitioner, in its brief, has questioned whether the Court should have allowed respondent to amend her answer to conform to the proof after the conclusion of the trial.  Petitioner can claim no surprise or prejudice.  The fair market rental value of the property has always been at issue, respondent
(continued...)

Generally, the notice of deficiency is presumed to be correct, and petitioner has the burden of showing otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). However, where respondent has asserted an increased deficiency, she has the burden of proof on that increase. Rule 142(a). The effect of respondent's amended answer, thus, is that respondent has the burden of showing that the fair market rental value of the property was less than that allowed in the notice of deficiency, while petitioner must show it was greater. See supra notes 1, 3.

Petitioner argues that Barker's valuation is so close to the figures in the notice of deficiency that his expert report should be excluded from evidence on the basis that it is immaterial. Petitioner hopes that the Court, after excluding this report, will accept Berry's testimony as proof that the rents of $15,600 and $14,979 were reasonable. Berry did not testify about the rental deductions, and petitioner offered no proof as to the fair market rental value of its property.

This Court is "the trier of the facts, the judge of the credibility of witnesses and of the weight of the evidence, and the drawer of appropriate inferences." Hamm v. Commissioner, 325

---

[7](...continued)
served a copy of her expert's report on petitioner well in advance of the trial, and respondent's trial memorandum made reference to the possibility of filing just such a motion. Katz v. Commissioner, T.C. Memo. 1989-191; see Estate of Horvath v. Commissioner, 59 T.C. 551, 555 (1973). Under these circumstances, it was appropriate for the Court to grant respondent leave to amend her answer.

F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347.  The determination of fair market value is a question of fact. McGuire v. Commissioner, 44 T.C. 801, 812 (1965).  "Such a [factual] determination is one that is entitled to be made on all the elements of the particular case."  Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976) (quoting Heil Beauty Supplies v. Commissioner, 199 F.2d 193, 195 (8th Cir. 1952)), affg. T.C. Memo. 1974-285.  An expert's opinion may be of assistance to the Court, but the Court may reach a determination of value based upon its own analysis of all the evidence in the record. Silverman v. Commissioner, supra at 933.

Barker's report explains his methodology and the factual basis for his conclusions in compliance with the requirements of Rule 143(f) regarding expert witness reports.  We admitted Barker's report into evidence and do not choose to disregard it, as petitioner seems to suggest.

Petitioner has accepted Barker as an expert in real estate appraisal and has not contested the substance of his testimony. Berry testified only to a description of the property and that it served as petitioner's offices and storage space in spite of its noncompliance with local zoning.  The evidence suggests no possibility of rezoning during the years at issue or in the foreseeable future.  Petitioner has offered no evidence of the property's fair market rental value.  We find the fair market rental value of the property to be $8,300 per year.

Gross Receipts

    a.  August 1990 Bank Deposits of $88,181

This issue was not raised in the assignment of errors in the petition nor in petitioner's trial memorandum or supplemental trial memorandum, and the issue probably should be treated as conceded by petitioner. Rule 34(b)(4). However, without objection from respondent, it was raised in petitioner's opening statement at the beginning of the trial and will be treated as tried by consent of the parties. Petitioner requests the Court to make an ultimate finding of fact that respondent erroneously increased its income for its taxable year ended July 31, 1990, by this $88,181 amount.

The parties agree that $88,181 in checks were deposited in petitioner's bank account in August of 1990, were reported as part of gross receipts for its taxable year ended July 31, 1991, and on audit by respondent were removed from that year and included as gross receipts for the taxable year ended July 31, 1990. There agreement ends.

The parties disagree as to whether petitioner is a cash basis or an accrual basis taxpayer. At trial, in response to the Court's direct question, respondent's counsel advised the Court that petitioner was a cash basis taxpayer. The Court was not advised otherwise thereafter during the trial. In its post-trial brief, petitioner argues that as a C corporation it necessarily had to be on the accrual method of accounting, citing section

448(a)(1).  However, section 448(b)(3) provides an exception for C corporations with gross receipts of less than $5,000,000.

The record does not establish whether petitioner is a cash basis or an accrual basis taxpayer.  Berry, petitioner's president and sole shareholder, was not asked about the matter. While petitioner characterizes the issue as whether or not petitioner was an accrual basis taxpayer, it seems to be simply a matter of constructive receipt of income.  Berry testified that he deposited the corporation's checks in the bank and that in his view the funds were not available to his corporation until he made such deposits.  If, prior to August 1, Berry had in his possession checks in payment of work performed by the corporation prior to August 1, the fact that he did not deposit such checks into the bank account until early August would be irrelevant. The income would have been constructively received by the corporation prior to August 1 whether petitioner was a cash basis or an accrual basis taxpayer.

We hold that petitioner has not established that respondent erred in shifting the gross receipts of $88,181 from its taxable year ended July 31, 1991, to its taxable year ended July 31, 1990.  Indeed, as will be discussed below, petitioner has in effect stipulated to this adjustment.

b. <u>Any August 1989 Bank Deposits to be Shifted</u>
<u>from FYE 7-31-90 to FYE 7-31-89</u>

While no issue was raised in the petition as to the $88,181 August 1990 bank deposits, petitioner did assign as error

respondent's failure to make a similar adjustment for August 1989 bank deposits.

In paragraph 4.(h) of its petition to the Court, petitioner assigned as error the following:

> The Commissioner erred in failing to reduce gross receipts for Petitioner's taxable year ended July 31, 1990 [8-01-89 to 7-31-90], by amounts deposited to Petitioner's bank account during August of 1989 which represent payment of work performed by the Petitioner during its fiscal year ended July 31, 1989 [8-01-88 to 7-31-89]. [Bracketed material added by the Court.]

Respondent denied that allegation in the answer and at trial asserted that petitioner had never submitted any substantiation as to any such August 1989 bank deposits that should be shifted. Petitioner still has not submitted any substantiation.

At trial petitioner presented Berry's testimony and proffered No. 2's bank statement for August of 1989. No. 2's August 1989 bank statement merely showed that deposits of $38,906.68 were made that month and that deposits of $17,070.12 were made during the first 3 days of that month, the 3 days about which petitioner's counsel questioned Berry. Nothing in that bank statement served to show the date petitioner received the checks or when the work was performed. Petitioner called Berry as its witness. As petitioner's president and sole shareholder, Berry is the individual who should have personal knowledge as to when work was performed, when payment for such work was received, and when the payment checks were deposited in the bank. He was not asked about these matters in any meaningful way. Neither

Berry's testimony nor the bank statement established that there was any amount that should be shifted out of the taxable year ended July 31, 1990, as petitioner asserts.  The Court then declined to receive No. 2's August 1989 bank statement into evidence.  The document had no probative value.  Moreover, while alleging error for its taxable year ended July 31, 1990, petitioner failed to address the fact that, under its theory, if gross receipts were taken out of that taxable year, they would have to be included in the preceding taxable year ended July 31, 1989 (8-01-88 to 7-31-89), when the work was performed.[8]

For its taxable year ended July 31, 1989, petitioner reported on its corporate tax return gross receipts of $614,178 and for its taxable year ended July 31, 1990, reported gross receipts of $513,413.  Petitioner admitted in paragraph 5.(a) of its petition that it had those gross receipts for each of those years.  For its taxable year ended April 30, 1990 (5-01-89 to 4-

---

[8]  Petitioner's assignment of error (Pet. par. 4.(h)), its supplemental trial memorandum first identifying the August 1989 bank deposits as a factual dispute for trial, and its post-trial brief consistently treat this issue as bank deposits made in August 1989 for work performed _during_ FYE 7-31-89 (8-01-88 to 7-31-89).  We note that in par. 5.(h) of the petition where petitioner alleged facts in support of its assignment of error (Rule 34(b)(5)), there is some confusion as to the fiscal year or years _from_ which and _to_ which petitioner seeks to shift gross receipts.  The last sentence of par. 5.(h) seems to suggest that the August 1989 bank deposits "represent income for the taxable year ended July 31, 1988."  In any event, Berry was not questioned about any work performed (and/or paid for) _during_ FYE 7-31-89 or _during_ FYE 7-31-88.  No. 2 was not organized until March 23, 1989.  Moreover the parties' stipulation of facts accounts for all gross receipts of both petitioner and No. 2.

30-90), No. 2 reported gross receipts of $248,662, and for its taxable year ended April 30, 1991 (5-01-90 to 4-30-91), reported zero gross receipts. In the notice of deficiency respondent combined the gross receipts of petitioner and No. 2; respondent increased petitioner's gross receipts for its fiscal year ended July 31, 1989, from $614,178 to $750,112 for an increase of $135,934, and for its fiscal year ended July 31, 1990, increased petitioner's gross receipts from $513,413 to $714,322 for an increase of $200,909. Petitioner stipulated to these additional gross receipts in the amounts of $135,934 and $200,909 for those respective years.

The increased gross receipts of $135,934 for the taxable year ended July 31, 1989, and $200,909 for the taxable year ended July 31, 1990, to which petitioner stipulated, total $336,843; that total amount exceeds No. 2's gross receipts of $248,662 by exactly $88,181. While the record does not show how or on what basis No. 2's gross receipts of $248,662 were allocated between the two taxable years ending July 31, 1989 and 1990, it is clear that the additional gross receipts to which petitioner stipulated included all of No. 2's gross receipts plus the $88,181 August 1990 bank deposits that were shifted from petitioner's taxable year ended July 31, 1991 to its taxable year ended July 31, 1990.

The parties' stipulation of facts covers all of the gross receipts of both petitioner and No. 2. The Court holds petitioner to the stipulation and is not persuaded that there is

any further amount of gross receipts that should be shifted to or from any of the years.[9]

Negligence Addition and Penalty

If any part of any underpayment of tax required to be shown on a return is due to negligence (or disregard of rules or regulations), section 6653(a)(1) imposes an addition to tax equal to 5 percent of the entire underpayment.  Section 6653(c) defined "underpayment" for this purpose.  For purposes of section 6653(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code.  Sec. 6653(a)(3).  Respondent has determined that petitioner's deficiency for taxable year ended July 31, 1989, was due to negligence.

Section 6662 imposes a penalty on any portion of an underpayment of tax attributable to negligence or disregard of rules or regulations.  Sec. 6662(a) and (b)(1).  For purposes of section 6662, just as for section 6653, negligence includes any failure to make a reasonable attempt to comply with the internal revenue laws.  Sec. 6662(c).  Section 6664 defines "underpayment"

---

[9] Petitioner has never asked to be relieved of the stipulation but instead argued that the stipulation merely combined the gross receipts of petitioner and No. 2.  That is not correct.  While petitioner did not cooperate during the pretrial period and has never submitted any substantiation for any amount of gross receipts that should be shifted from one year to another, respondent's counsel offered at trial to consider any documentation petitioner submitted.  Respondent's counsel no doubt would again extend her gracious offer during the Rule 155 proceedings.

for the purpose of this penalty. However, no penalty will apply "with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Sec. 6664(c). Respondent has determined the entire amount of petitioner's deficiency for the taxable year ended July 31, 1990, was due to negligence.

Petitioner has provided no evidence of its efforts to comply with the applicable internal revenue laws other than (1) it used a bookkeeping service to prepare its Federal income tax returns, and (2) it made available its check stubs, bank statements, and other paperwork to that service. Use of an accountant alone does not constitute reasonable reliance on that professional's advice. Ma-Tran Corp. v. Commissioner, 70 T.C. 158 (1978). The taxpayer must establish that the correct information was provided to the accountant and that the items incorrectly claimed or reported in the return were the result of the accountant's error. Id. at 173; Enoch v. Commissioner, 57 T.C. 781, 803 (1972).

Petitioner's deficiencies stemmed from several sources: filing separate returns for No. 2, inclusion of $88,181 of gross receipts in an incorrect taxable year, and improper depreciation and rental expense deductions. As to the improper depreciation claimed on the Chrysler New Yorker automobile and the boat each year, the excessive rental expense deductions each year, and the $88,181 gross receipts issue for 1990, petitioner has not

demonstrated that it supplied adequate information to A & F regarding any of these items, nor that any portion of those deficiencies was the result of an error on the part of A & F. Thus for the taxable year ended July 31, 1989, some part of the deficiency was attributable to negligence and the negligence addition applies to the entire underpayment; for the taxable year ended July 31, 1990, the negligence penalty also applies to the portions of the underpayment attributable to the depreciation and rental expense items as well as to the $88,181 gross receipts item.[10]

However, most of the adjustments in the notice of deficiency flowed from the fact that respondent combined the gross receipts, costs of sales, interest income, and other deductions of petitioner and No. 2. The Court is satisfied that when Berry organized No. 2 he had to have had legal advice and assistance to do so, and, with the organization of No. 2, filing separate corporate returns flowed as a natural consequence. No. 2 really only filed one return, the one for its taxable year ended April 30, 1990; the one for its taxable year ended April 30, 1991, just reported a few deduction items totaling $29,446. In its petition to this Court, petitioner acting through its present counsel asserted that it and No. 2 were separate corporations and that

---

[10] In each instance the Court means "underpayment" as properly defined in sec. 6653(c) and sec. 6664, respectively. We note that No. 2 reported tax of $7,165 on its return filed for FYE 4-30-90 that respondent apparently has not taken into consideration in computing the negligence addition (penalty).

each had properly reported the various items separately.  Shortly before trial petitioner conceded that the two were really a single corporation and stipulated to (or never challenged) the adjustments in the notice of deficiency for gross receipts, costs of sales, interest income, and other deductions.

Thus, the experiment with No. 2 was brief, and the Court cannot conclude that it was originally unreasonable or done in bad faith.  That petitioner's legal position has now been abandoned and that petitioner has now conceded it and No. 2 were essentially a single corporation do not automatically mean that petitioner was negligent or that there was not a reasonable cause for, and that petitioner did not act in good faith in taking, its original position.[11]

Accordingly, to the extent that any underpayment properly defined for the taxable year ended July 31, 1990, is attributable to combining the gross receipts, costs of sales, interest income, and other deductions of petitioner and No. 2, the Court does not sustain respondent's determination of a negligence penalty.

---

[11]  See, however, supra note 8.  If petitioner were contending that some part of the reported gross receipts for the taxable year ended July 31, 1990, should be reduced by No. 2's August 1989 bank deposits allegedly representing payment for work performed during FYE 7-31-88, the Court would conclude otherwise on the negligence penalty issue.  No. 2 was not even organized until March 23, 1989.  The Court does not think that petitioner could in good faith have thought that income earned by petitioner during FYE 7-31-88 (8-01-87 to 7-31-88) could be treated as No. 2's gross receipts.  However, the Court has not found that any part of No. 2's August 1989 bank deposits represent gross receipts to be shifted to another fiscal year, so the Court's concern becomes moot.

However, the Court sustains the negligence penalty for any underpayment for that year attributable to (1) the $88,181 of gross receipts that respondent properly shifted from the taxable year ended July 31, 1991, to taxable year ended July 31, 1990; (2) depreciation deductions disallowed for the automobile and boat; and (3) the excessive portion of the rental expense deduction.

Based upon the stipulations and the above holdings,

Decision will be entered

under Rule 155.